IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SPATIAL GENOMICS, INC. and THE
CALIFORNIA INSTITUTE OF
TECHNOLOGY,

          Plaintiffs,

     v.

10X GENOMICS, INC.,

          Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

**REDACTED PUBLIC VERSION**

C.A. No.

**JURY TRIAL DEMANDED**

## COMPLAINT

Spatial Genomics, Inc. ("SG") and the California Institute of Technology ("Caltech") (collectively "Plaintiffs"), for their Complaint against 10x Genomics, Inc. ("10x" or "Defendant") allege as follows:

## NATURE OF THE ACTION

1.    This is an action by Plaintiffs against Defendant for infringement of United States Patent Nos. 10,457,980 (the "'980 patent"); 11,473,129 (the "'129 patent"); 12,305,224 (the "'224 patent"); 12,601,007 (the "'007 patent"); and 12,630,868 (the "'868 patent") (collectively, the "Asserted Patents").

2.    This action arises under the patent laws of the United States, Title 35, United States Code, including 35 U.S.C. § 271.

## THE PARTIES

3.    SG is a Delaware corporation. Its principal place of business is 145 Vista Ave Suite 111, Pasadena, CA 91107. SG is the exclusive licensee of the Asserted Patents.

1

4.   Caltech is a non-profit private university organized under the laws of the State of California, with its principal place of business at 1200 East California Boulevard, Pasadena, CA 91125. Caltech is the assignee of the Asserted Patents.

5.   On information and belief, 10x is a Delaware corporation. On information and belief, its principal place of business is 6230 Stoneridge Mall Road, Pleasanton, CA 94588.

6.   On information and belief, 10x makes, uses, sells, offers to sell, exports, and/or imports in the United States products, services, and components that have been and are used to infringe one or more claims of the Asserted Patents, actively induces infringement by others of the Asserted Patents, and contributes to the infringement by others of the Asserted Patents.

## JURISDICTION AND VENUE

7.   This civil action for patent infringement arises under the patent laws of the United States, 35 U.S.C § 1 et seq., including 35 U.S.C. § 271. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

8.   This Court has personal jurisdiction over 10x, and venue is proper in this district pursuant to 28 U.S.C. § 1400(b), because 10x is a Delaware corporation and thus resides in this district.

## BACKGROUND

**SG's Innovative seqFISH Technology and GenePS Platform**

9.   Since its inception, SG has focused on developing sequential fluorescence in situ hybridization (seqFISH) technology covered by the Asserted Patents and exclusively licensed by SG from Caltech.

10. SG's Gene Positioning System ("GenePS") platform is an automated instrument that uses seqFISH to perform spatial genomics analysis, and is part of a complete platform offered for sale by SG that includes instruments, reagents, and analysis software.

11. SG began public commercial sales of the GenePS platform in 2023.

12. SG has marked each GenePS physical instrument with the patent number(s) of the Asserted Patents following issuance in accordance with 35 U.S.C. § 287.

13. seqFISH is an advanced biomolecular analysis method that can be used to identify and visualize single nucleic acids (e.g., a single mRNA) within cells. With seqFISH, targets are identified by a barcode that is built up over multiple cycles, based on images of detectable oligonucleotide probes. During each cycle, a highly curated set of fluorescently tagged oligonucleotide probes are hybridized to specific coding sequences in the targets or nucleic acids that have been co-located with the target, detected by imaging, and then removed or quenched. The process is repeated to build up a series of detectable color signals (e.g. red – green – yellow), which constitute a barcode indicative of the presence of a particular target at each particular location. In this way, seqFISH can provide a high-fidelity map of target nucleic acids as they exist in tissues and cells, and can do so with single-molecule resolution within cells.

**10x's Infringing Spatial Biology Platforms**

14. The "Accused Products" are all products, components, and services that are made, used, performed, offered for sale, sold, and/or imported into the United States by or on behalf of 10x in connection with its spatial biology platforms, including specifically the Xenium platform, which includes the Xenium Analyzer instrument and related accessories and consumables.

15. Upon information and belief, 10x commercially launched its Xenium platform on December 8, 2022. The Xenium platform includes the Xenium Analyzer instrument, Xenium

reagents and panels, and Xenium Explorer software. 10x claims that the Xenium platform is designed to create spatial maps of gene expression at cellular resolutions.

16.     10x's Xenium Analyzer instrument enables its users to detect and preserve the cellular location of hundreds of RNA targets directly in a fresh frozen or FFPE tissue section, providing users with a map of gene expression patterns. 10x's Xenium Analyzer instrument uses circularizable probes specific to target transcripts followed by enzymatic amplification to create a target for fluorescent probe hybridization. On the Xenium Analyzer instrument, microscope images of the tissue detect the location of each fluorescent probe, which is then removed. Successive rounds of fluorescent probe hybridization, imaging and removal creates an optical signature that reveals the identity of the RNA at a location within each cell of a tissue.

17.     10x's Xenium Analyzer instrument performs successive rounds of fluorescent probe hybridization, imaging, and probe removal to generate an optical signature for each gene transcript. Image processing, decoding, and secondary analysis are performed in real-time on the instrument. The Xenium Analyzer captures vertical stacks of images at every cycle (of fluorescent probe hybridization, imaging, and probe removal) and in every channel for multiple fields of view, which need to be processed, corrected, and stitched to build a single image representing the tissue section. The pipeline detects puncta in every cycle and every image to observe all potential mRNA. These puncta are decoded into gene IDs, and each decoded transcript is assigned a quality score.

18.     In addition, 10x provides necessary installation services to its customers for each Xenium Analyzer instrument, including a Vibration Isolation Table and Xenium Analysis Computer.

19.     10x also sells accessories and consumables required for operation of the Xenium Analyzer instrument. For example, 10x sells an Instrument Bundle and several Accessory Kits. 10x sells additional kits, reagents, and equipment for use with the Xenium Analyzer instrument.

20.     10x sells pre-designed, add-on custom, and standalone custom Gene Panels for use with the Xenium Analyzer instrument. 10x also sells protein subpanels related to immunology, cancer, and proliferation markers for use with the Xenium Analyzer instrument.

21.     10x provides detailed instructions to its customers regarding setup, preparation, and use of the Xenium Analyzer instrument along with its accessories and consumables.

22.     10x reports that sales of Xenium instruments and related consumables have increased year-over-year from 2023-2025. 10x reports that its products are primarily sold to academic and translational researchers and biopharmaceutical companies. 10x reports that it bundles its Xenium Analyzer instruments and proprietary microfluidic chips, slides, reagents and other consumables for the Xenium platform. 10x also bundles its software with the Xenium Analyzer instrument to guide its customers through the workflow, from sample preparation through analysis and visualization. 10x's customers purchase instruments and consumables from 10x for use by the customer in accordance with 10x's instructions.

23.     10x reports that its customers use the Xenium platform to map tumor microenvironments, validate potential novel drug targets, and understand cellular organization within native tissue. 10x identifies the Asia-Pacific Spatial Translational Research Alliance as an example of a Xenium platform customer that uses custom Xenium panels.

24.     Upon information and belief, other 10x customers for the Xenium platform include the Genome Institute of Singapore, the University of Adelaide, MD Anderson Cancer Center, Duke University, and the University of Michigan. Upon information and belief,

5

additional customers of the 10x Xenium platform include the University of Wisconsin-Madison; the University of Alabama at Birmingham; the Indiana University School of Medicine; and the University of Pittsburgh - Hillman Cancer Center.

25.    On April 18, 2026, 10x announced its new spatial biology platform, Atera, which includes an all-in-one instrument for sample imaging, liquid handling, hardware stabilization, and onboard analysis. While 10x states it has not yet commercially launched the Atera platform, 10x has reported that researchers have used the Atera platform provided by 10x on an early access basis.

**The Asserted Patents**

26.    The Asserted Patents are assigned to Caltech and exclusively licensed to SG.

### a.    The '980 Patent

27.    The '980 patent issued on Oct. 29, 2019, and is attached as Exhibit 1. The '980 patent issued from U.S. Patent Application No. 14/435,735 filed on Apr. 14, 2015, which is a National Stage entry of International Application No. PCT/US2014/36258 filed on Apr. 30, 2014, which in turn claims priority to U.S. Provisional Application No. 61/817,651 filed on Apr. 30, 2013 and U.S. Provisional Application No. 61/971,974 filed on Mar. 28, 2014.

28.    Claims 1 and 2 are the independent claims of the '980 patent.

29.    Claim 1 recites:

> A method of providing a unique molecular barcode for each unique nucleic acid molecule in a plurality of nucleic acid molecules in a sample, comprising the steps of:
> (a) performing a first contacting step that involves contacting the sample with a first plurality of detectably labeled oligonucleotides, each of which targets a nucleic acid molecule and is labeled with a detectable moiety, so that the first plurality comprises at least:
> (i) a first oligonucleotide targeting a first nucleic acid molecule and labeled with a first detectable moiety; and

(ii) a second oligonucleotide targeting a second nucleic acid molecule and labeled with a second detectable moiety;

(b) imaging the sample after the first contacting step so that interaction by oligonucleotides of the first plurality with their target sequences is detected;

(c) performing a second contacting step that involves contacting the sample with a second plurality of detectably labeled oligonucleotides, which second plurality includes oligonucleotides targeting nucleic acid molecules that are targeted by the first plurality so that the second plurality comprises at least:

(i) a third oligonucleotide, optionally identical in sequence to the first oligonucleotide, targeting the first nucleic acid molecule; and

(ii) a fourth oligonucleotide, optionally identical in sequence to the second oligonucleotide, targeting the second nucleic acid molecule,

wherein the second plurality differs from the first plurality in that at least one of the oligonucleotides present in the second plurality is labeled with a different detectable moiety than the corresponding oligonucleotide targeting the same nucleic acid molecule in the first plurality, so that, in the second plurality:

(iii) the third oligonucleotide is labeled with the first detectable moiety, the second detectable moiety or a third detectable moiety; and

(iv) the fourth oligonucleotide is labeled with the first detectable moiety, the second detectable moiety, the third detectable moiety, or a fourth detectable moiety,

wherein either the third oligonucleotide is labeled with a different detectable moiety than was the first oligonucleotide, or the fourth oligonucleotide is labeled with a different detectable moiety than was the second oligonucleotide, or both;

(d) imaging the sample after the second contacting step so that interaction by oligonucleotides of the second plurality with their target nucleic acid molecules is detected; and

(e) optionally repeating the contacting and imaging steps, each time with a new plurality of detectably labeled oligonucleotides comprising oligonucleotides that target nucleic-acid molecules targeted by the first and second pluralities, wherein each utilized plurality differs from each other utilized plurality, due to at least one difference in detectable moiety labeling of oligonucleotides targeting the same nucleic acid molecule,

wherein steps (a) to (e) produce a unique molecular barcode for each unique nucleic acid molecule in the sample.

30.     Claim 2 recites:

A method of providing a unique molecular barcode for each unique
   transcript or DNA molecule in a plurality of transcripts and DNA
   molecules in a sample, comprising the steps of:
   (a) performing a first contacting step that involves contacting the
       sample with a first plurality of detectably labeled
       oligonucleotides, each of which targets a transcript or DNA
       locus and is labeled with a detectable moiety, so that the first
       plurality comprises at least:
       (i) a first oligonucleotide targeting a first transcript or DNA
           locus and labeled with a first detectable moiety; and
       (ii) a second oligonucleotide targeting a second transcript or
           DNA locus and labeled with a second detectable moiety;
   (b) imaging the sample after the first contacting step so that
       hybridization by oligonucleotides of the first plurality with
       their target sequences is detected;
   (c) performing a second contacting step that involves contacting
       the sample with a second plurality of detectably labeled
       oligonucleotides, which second plurality includes
       oligonucleotides targeting transcripts and/or DNA loci that are
       targeted by the first plurality so that the second plurality
       comprises at least:
       (i) a third oligonucleotide, optionally identical in sequence to
           the first oligonucleotide, targeting the first transcript or
           DNA locus; and
       (ii) a fourth oligonucleotide, optionally identical in sequence
           to the second oligonucleotide, targeting the second
           transcript or DNA locus,
   wherein the second plurality differs from the first plurality in that
       at least one of the oligonucleotides present in the second
       plurality is labeled with a different detectable moiety than the
       corresponding oligonucleotide targeting the same transcript or
       DNA locus in the first plurality, so that, in the second
       plurality:
           (iii) the third oligonucleotide is labeled with the first
               detectable moiety, the second detectable moiety or a
               third detectable moiety; and
           (iv) the fourth oligonucleotide is labeled with the first
               detectable moiety, the second detectable moiety, the
               third detectable moiety, or a fourth detectable moiety,
   wherein either the third oligonucleotide is labeled with a different
       detectable moiety than was the first oligonucleotide, or the
       fourth oligonucleotide is labeled with a different detectable
       moiety than was the second oligonucleotide, or both;

8

> (d) imaging the sample after the second contacting step so that hybridization by oligonucleotides of the second plurality with their target sequences is detected; and
>
> (e) optionally repeating the contacting and imaging steps, each time with a new plurality of detectably labeled oligonucleotides comprising oligonucleotides that target transcripts or DNA loci targeted by the first and second pluralities, wherein each utilized plurality differs from each other utilized plurality, due to at least one difference in detectable moiety labeling of oligonucleotides targeting the same transcript or DNA locus,
>
> wherein steps (a) to (e) produce a unique molecular barcode for each unique transcript or DNA molecule in the sample.

31. Dependent claims of the '980 patent include claim 9, which recites: "The method of claim 1, comprising a step of removing a plurality of detectably labeled oligonucleotides after each imaging step."

32. The methods of one or more claims of the '980 patent are used by SG's GenePS platform.

### b.    The '129 Patent

33. The '129 patent issued on Oct. 18, 2022, and is attached as Exhibit 2. The '129 patent issued from U.S. Patent Application No. 16/572,511 filed Sep. 16, 2019, which is a continuation of U.S. Patent Application No. 14/435,735 filed on Apr. 14, 2015, which is a National Stage entry of International Application No. PCT/US2014/36258 filed on Apr. 30, 2014, which in turn claims priority to U.S. Provisional Application No. 61/817,651 filed on Apr. 30, 2013 and U.S. Provisional Application No. 61/971,974 filed on Mar. 28, 2014.

34. Claim 1 is the sole independent claim of the '129 patent.

35. Claim 1 recites:

> A method, comprising steps of:
> (a) contacting a sample comprising a plurality of target nucleic acids with a first plurality of detectably labelled

oligonucleotides to form a composition, which composition comprises at least:

   (i) a first detectably labelled oligonucleotide that interacts with a first target nucleic acid; and

   (ii) a second detectably labelled oligonucleotide that interacts with a second target nucleic acid;

wherein the first detectably labelled oligonucleotide is different from the second detectably labelled oligonucleotide and wherein all target nucleic acids comprise RNA;

(b) imaging the sample after the first contacting step so that interaction of the detectably labelled oligonucleotides with their target nucleic acid is detected;

(c) repeating the contacting and imaging steps, each time with a new plurality of detectably labelled oligonucleotides,

so that a target nucleic acid in the sample is described by a barcode, and can be differentiated from another target nucleic acid in the sample by a difference in their barcodes.

36.     Dependent claims of the '129 patent include claim 2, which recites "The method of claim 1 wherein at least one contacting step differs from another contacting step in the labelling of at least one of the first and second target nucleic acids." Another dependent claim 8 recites: "The method of claim 2 wherein the target nucleic acids are transcripts." Dependent claim 12 recites: "The method of claim 2 wherein each detectably labelled oligonucleotide interacts with its target nucleic acid through one or more intermediate oligonucleotides each of which is hybridized to the target nucleic acid." Dependent claim 28 recites: "The method of claim 2 or 12, wherein the barcode for the target nucleic acid in the sample includes no signal for one or more of the contacting steps." A further dependent claim, claim 52, recites: "The method of claim 2 wherein the sample comprises a cell."

37.     The methods of one or more claims of the '129 patent are used by SG's GenePS platform.

c.    **The '224 Patent**

38.    The '224 patent issued on May 20, 2025, and is attached as Exhibit 3. The '224 patent issued from U.S. Patent Application No. 18/906,096 filed on Oct. 3, 2024, a continuation of U.S. Patent Application No. 17/940,650 filed on Sep. 8, 2022, which is a continuation of U.S. Patent Application No. 16/572,511 filed on Sep. 16, 2019, which is a continuation of U.S. Patent Application No. 14/435,735 filed on Apr. 14, 2015, which is a National Stage entry of International Application No. PCT/US2014/36258 filed on Apr. 30, 2014, which in turn claims priority to U.S. Provisional Application No. 61/817,651 filed on Apr. 30, 2013 and U.S. Provisional Application No. 61/971,974 filed on Mar. 28, 2014.

39.    Claims 1 and 11 are the independent claims of the '224 patent.

40.    Claim 1 recites:

> A method, comprising steps of:
> (a) performing a first contacting step that comprises contacting a cell comprising a plurality of transcripts with a first plurality of detectably labeled oligonucleotides, each of which targets a transcript and is labeled with a detectable moiety, so that the first plurality comprises at least:
>   (i) a first oligonucleotide targeting a first transcript in the cell labeled with a first detectable moiety; and
>   (ii) a second oligonucleotide targeting a second transcript in the cell labeled with a second detectable moiety;
> (b) imaging the cell, after the first contacting step so that interaction by hybridizations of oligonucleotides of the first plurality with their target sequences are detected;
> (c) performing a second contacting step that comprises contacting the cell, with a second plurality of detectably labeled oligonucleotides, which second plurality includes oligonucleotides targeting transcripts that are targeted by the first plurality so that the second plurality comprises at least:
>   (i) a third oligonucleotide, optionally identical in sequence to the first oligonucleotide, targeting the first transcript through the one or more intermediate oligonucleotides; and

11

(ii) a fourth oligonucleotide, optionally identical in sequence to the second oligonucleotide, targeting the second transcript through one or more intermediate oligonucleotides, wherein the second plurality differs from the first plurality in that at least one of the oligonucleotides present in the second plurality is labeled with a different detectable moiety than the corresponding oligonucleotide targeting the same transcript in the first plurality, so that, in the second plurality:

(iii) the third oligonucleotide is labeled with the first detectable moiety, the second detectable moiety or a third detectable moiety; and

(iv) the fourth oligonucleotide is labeled with the first detectable moiety, the second detectable moiety, the third detectable moiety, or a fourth detectable moiety, wherein either the third oligonucleotide is labeled with a different detectable moiety than was the first oligonucleotide, or the fourth oligonucleotide is labeled with a different detectable moiety than was the second oligonucleotide, or both;

(d) imaging the cell after the second contacting step so that interaction by hybridization of oligonucleotides of the second plurality with their target sequences is detected; and

(e) optionally repeating the contacting and imaging steps, each time with a new plurality of detectably labeled oligonucleotides comprising oligonucleotides that target transcripts targeted by the first and second pluralities through the one or more intermediate oligonucleotides, wherein each utilized plurality differs from each other utilized plurality, due to at least one difference in detectable moiety labeling of oligonucleotides targeting the same transcript,

so that the detected signals barcode the first target transcript, and the second target transcript in the cell, wherein the target transcripts can be differentiated by a difference in their barcodes.

41.    Claim 11 recites:

A method, comprising steps of:

(a) performing a first contacting step that comprises contacting a cell comprising a plurality of transcripts with a first plurality of detectably labeled oligonucleotides, each of which targets a transcript and is

12

labeled with a detectable moiety, so that the first plurality

comprises at least:

    (i) a first oligonucleotide targeting a first transcript in the cell through one or more intermediate oligonucleotides, wherein the first oligonucleotide is labeled with a first detectable moiety; and

    (ii) a second oligonucleotide targeting a second transcript in the cell through one or more intermediate oligonucleotides, wherein the second oligonucleotide is labeled with a second detectable moiety;

(b) imaging the cell, after the first contacting step so that interaction by hybridizations of oligonucleotides of the first plurality with their target sequences are detected;

(c) performing a second contacting step that comprises contacting the cell, with a second plurality of detectably labeled oligonucleotides, which second plurality includes oligonucleotides targeting transcripts that are targeted by the first plurality so that the second plurality comprises at least:

    (i) a third oligonucleotide, optionally identical in sequence to the first oligonucleotide, targeting the first transcript through the one or more intermediate oligonucleotides; and

    (ii) a fourth oligonucleotide, optionally identical in sequence to the second oligonucleotide, targeting the second transcript through one or more intermediate oligonucleotides, wherein the second plurality differs from the first plurality in that at least one of the oligonucleotides present in the second plurality is labeled with a different detectable moiety than the corresponding oligonucleotide targeting the same transcript in the first plurality, so that, in the second plurality:

    (iii) the third oligonucleotide is labeled with the first detectable moiety, the second detectable moiety or a third detectable moiety; and

    (iv) the fourth oligonucleotide is labeled with the first detectable moiety, the second detectable moiety, the third detectable moiety, or a fourth detectable moiety, wherein either the third oligonucleotide is labeled with a different detectable moiety than was the first oligonucleotide, or the fourth oligonucleotide is labeled with a different detectable moiety than was the second oligonucleotide, or both;

13

(d) imaging the cell after the second contacting step so that interaction by hybridization of oligonucleotides of the second plurality with their target sequences is detected; and

(e) optionally repeating the contacting and imaging steps, each time with a new plurality of detectably labeled oligonucleotides comprising oligonucleotides that target transcripts targeted by the first and second pluralities through the one or more intermediate oligonucleotides, wherein each utilized plurality differs from each other utilized plurality, due to at least one difference in detectable moiety labeling of oligonucleotides targeting the same transcript,

so that the detected signals barcode the first target transcript, and the second target transcript in the cell, wherein the target transcripts can be differentiated by a difference in their barcodes.

42.     Dependent claims of the '224 patent include claim 20, which recites: "The method of claim 11, wherein at least one barcode includes no signal for one or more of the contacting steps." Another dependent claim, claim 4 recites: "The method of claim 1, further comprising a step of removing a plurality of detectably labeled oligonucleotides after each imaging step." Dependent claim 27 recites: "The method of claim 11, wherein the detectably labeled oligonucleotides comprise labels selected from three or four different labels."

43.     The methods of one or more claims of the '224 patent are used by SG's GenePS platform.

### d.     The '007 Patent

44.     The '007 patent issued on April 14, 2026, and is attached as Exhibit 4. The '007 patent issued from U.S. Patent Application No. 17/940,650 filed on Sep. 8, 2022, which is a continuation of U.S. Patent Application No. 16/572,511 filed on Sep. 16, 2019, which is a continuation of U.S. Patent Application No. 14/435,735 filed on Apr. 14, 2015, which is a National Stage entry of International Application No. PCT/US2014/36258 filed on Apr. 30,

14

2014, which in turn claims priority to U.S. Provisional Application No. 61/817,651 filed on Apr.

30, 2013 and U.S. Provisional Application No. 61/971,974 filed on Mar. 28, 2014.

45.    Claims 1 and 18 are the independent claims of the '007 patent.

46.    Claim 1 recites:

A method, comprising steps of:
(a) performing a first contacting step that comprises contacting a cell comprising a plurality of target nucleic acids, the target nucleic acids comprising nucleic acids obtained by subjecting single stranded nucleic acids in the cell to amplification, with a first plurality of detectably labeled oligonucleotides, each of which targets a nucleic acid and is labeled with a detectable moiety, so that the first plurality comprises at least:
    (i)   a first oligonucleotide targeting a first nucleic acid in the cell, the first oligonucleotide being labeled with a first detectable moiety; and
    (ii)  a second oligonucleotide targeting a second nucleic acid in the cell, the second oligonucleotide being labeled with a second detectable moiety;
(b) imaging the cell, after the first contacting step so that interaction by hybridizations of oligonucleotides of the first plurality with their target nucleic acids are detected;
(c) performing a second contacting step that comprises contacting the cell, with a second plurality of detectably labeled oligonucleotides, which second plurality includes oligonucleotides targeting nucleic acids that are targeted by the first plurality so that the second plurality comprises at least:
    (i)   a third oligonucleotide, optionally identical in sequence to the first oligonucleotide, targeting the first nucleic acid; and
    (ii)  a fourth oligonucleotide, optionally identical in sequence to the second oligonucleotide, targeting the second nucleic acid, wherein the second plurality differs from the first plurality in that at least one of the oligonucleotides present in the second plurality is labeled with a different detectable moiety than the corresponding oligonucleotide targeting the same nucleic acid in the first plurality, so that, in the second plurality:

(iii) the third oligonucleotide is labeled with the first detectable moiety, the second detectable moiety or a third detectable moiety; and

(iv) the fourth oligonucleotide is labeled with the first detectable moiety, the second detectable moiety, the third detectable moiety, or a fourth detectable moiety, wherein either the third oligonucleotide is labeled with a different detectable moiety than was the first oligonucleotide, or the fourth oligonucleotide is labeled with a different detectable moiety than was the second oligonucleotide, or both;

(d) imaging the cell after the second contacting step so that interaction by hybridization of oligonucleotides of the second plurality with their target nucleic acids is detected; and

(e) optionally repeating the contacting and imaging steps, each time with a new plurality of detectably labeled oligonucleotides comprising oligonucleotides that target nucleic acids targeted by the first and second pluralities, wherein each utilized plurality differs from each other utilized plurality, due to at least one difference in detectable moiety labeling of oligonucleotides targeting the same nucleic acid,

so that the detected signals barcode the first target nucleic acid, and the second target nucleic acid in the cell, wherein the target nucleic acids can be differentiated by a difference in their barcodes.

47.    Dependent claims of the '007 patent include claim 3, which recites: "The method of claim 1, wherein the amplification produces nucleic acids that are localized to the nucleic acids subjected to amplification". Another dependent claim, claim 6, recites: "The method of claim 1, further comprising a step of removing a plurality of detectably labeled oligonucleotides after each imaging step." Dependent claim 12 recites: "The method of claim 1, wherein at least one barcode includes no signal for one or more of the contacting steps."

48.    The methods of one or more claims of the '007 patent are used by SG's GenePS platform.

16

d.      The '868 Patent

49.      The '868 patent issued on May 19, 2026, and is attached as Exhibit 4. The '868 patent issued from U.S. Patent Application No. 17/940,356 filed on Sep. 8, 2022, which is a continuation of U.S. Patent Application No. 16/572,511 filed on Sep. 16, 2019, which is a continuation of U.S. Patent Application No. 14/435,735 filed on Apr. 14, 2015, which is a National Stage entry of International Application No. PCT/US2014/36258 filed on Apr. 30, 2014, which in turn claims priority to U.S. Provisional Application No. 61/817,651 filed on Apr. 30, 2013 and U.S. Provisional Application No. 61/971,974 filed on Mar. 28, 2014.

50.      Claims 1 and 2 are the independent claims of the '868 patent.

51.      Claim 2 recites:

> A method, comprising steps of:
>       (a)    contacting a sample comprising a plurality of target nucleic acids, proteins, or combination thereof, with a first plurality of detectably labeled oligonucleotides to form a composition, which composition comprises at least:
>       (i)    a first detectably labelled oligonucleotide that interacts with a first target nucleic acid, protein, or combination thereof; and
>       (ii)    a second detectably labelled oligonucleotide that interacts with a second target nucleic acid, protein, or combination thereof;
> wherein the first detectably labelled oligonucleotide is different from the second detectably labelled oligonucleotide;
>       (b)    imaging the sample after the first contacting step so that interactions of the detectably labelled oligonucleotides with their targets are detected;
>       (c)    repeating the contacting and imaging steps, each time with a new plurality of detectably labelled oligonucleotides,
> so that a target in the sample is described by a barcode, and can be differentiated from another target in the sample by a difference in their barcodes.

17

52.    Dependent claims of the '868 patent include claim 27, which recites: "The method of claim 2, wherein each of the first and second target nucleic acids is a transcript." Another dependent claim, claim 28 recites: "The method of claim 27, wherein each of the first and second detectably labeled oligonucleotides interacts with its target via an intermediate oligonucleotide that hybridized to the target." Another dependent claim, claim 38 recites: "The method of claim 28, wherein each of the first and second detectably labeled oligonucleotides interacts with its target via nucleic acids obtained by subjecting the intermediate oligonucleotide to amplification."

53.    Another dependent claim 29 recites:

> The method of claim 2, wherein:
> the first detectably labelled oligonucleotide interacts with the first target nucleic acid;
> the second detectably labelled oligonucleotide interacts with the second target nucleic acid;
> each of the first target nucleic acid and second target nucleic acid is a nucleic acid within a cell;
> and each of the first and second target nucleic acids is described by a barcode, and can be differentiated from each other by a difference in their barcodes.

54.    Dependent claim 30 recites: "The method of claim 29, wherein each of the first and second target nucleic acids is a transcript." Dependent claim 45 recites: "The method of claim 2, wherein at least one barcode includes no signal for one or more of the contacting steps." Dependent claim 46 recites: "The method of claim 2, further comprising a step of removing the plurality of detectably labeled oligonucleotides after each imaging step."

55.    The methods of one or more claims of the '868 patent are used by SG's GenePS platform.

18

**10x's Knowledge of the Asserted Patents and 10x's Infringement Thereof**

56.     On several occasions beginning on or around June 1, 2021, 10x and SG executives discussed potential business opportunities.

57.     10x had knowledge of the '980 Patent as early as July 30, 2021, as evidenced by U.S. Patent No. 12,360,105 assigned to 10x, which incorporates the '980 Patent by reference in the specification.

58.     As evidenced by 10x's deposition of Prof. Long Cai on April 24, 2024 in connection with a patent infringement action involving Vizgen, Inc., 10x had knowledge of the '129 Patent prior to that date.

59.     In that case, Vizgen had asserted that 10x's Xenium system infringed U.S. Patent No. 11,098,303 (the "'303 patent") to which Vizgen held an exclusive license.

60.     ██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████

61.     As evidenced by 10x's deposition of Prof. Long Cai on April 24, 2024, 10x had knowledge, or was willfully blind to the existence, of one or more of the Asserted Patents and knew, or was willfully blind to the fact, that the Accused Products infringed one or more claims of the Asserted Patents.

62.     ██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████

19

**10x Has Caused Irreparable Harm to SG**

63.     10x has sold and continues to sell infringing Accused Products without a license to any of the Asserted Patents.

64.     10x and SG are direct competitors in the market. The Accused Products, including 10x's Xenium platform, directly compete with SG's GenePS platform.

65.     On or around December 8, 2022, 10x entered the market with the unlicensed Accused Products, thereby entering the nascent spatial genomics market before public commercial sales of SG's licensed GenePS platform began in 2023.

66.     Upon information and belief, 10x has had knowledge of the family of the Asserted Patents as early as June 1, 2021.

67.     If 10x had not sold the infringing Accused Products without license to the Asserted Patents, SG would have been able to sell its GenePS platform to those customers under license to the Asserted Patents.

68.     10x's sales and marketing of the Accused Products without license to the Asserted Patents has irreparably harmed SG.

## COUNT I: Infringement of the '980 Patent

69.     Plaintiffs incorporate the foregoing paragraphs of the Complaint by reference as if fully set forth herein.

70.     Caltech is the sole assignee of the '980 patent.

71.     SG is the exclusive licensee of the '980 patent.

72.     10x has directly infringed and continues to directly infringe one or more claims of the '980 patent, literally or under the doctrine of equivalents, by performing in the United States without authority each step of the claimed methods in conjunction with the Accused Products

20

and/or components thereof. Attachment A provides an exemplary infringement claim chart for claims 1 and 9 of the '980 patent and exemplary and/or representative Accused Products.

73.     10x is and has been aware of the '980 patent and that the conduct identified herein would result in the infringement of one or more claims of the '980 patent. 10x has been aware of the '980 patents and its infringement at least since August 4, 2026, when SG notified 10x of the '980 patent and its infringement, and at least since the filing and service of this Complaint. On information and belief, 10x was aware of the patent family containing the '980 patent based on business discussions between 10x and SG conducted on or around June 1, 2021.

74.     10x has actively induced and continues to actively induce infringement, literally or under the doctrine of equivalents, of one or more claims of the '980 patent under 35 U.S.C. § 271(b) by making and selling the Accused Products and/or components thereof in the United States and intentionally instructing or otherwise encouraging others, including 10x's customers and/or end users such as scientists working in laboratories that purchase the Accused Products and/or components thereof, to use the Accused Products and/or components thereof in the United States in a manner that infringes one or more claims of the '980 patent. On information and belief, 10x provided this instruction and encouragement to its actual and prospective customers and/or end users with the knowledge and intent that doing so would result in the infringement of one or more claims of the '980 patent by those customers and/or end users. One or more of 10x's customers and/or end users of the Accused Products and/or components thereof have directly infringed and continue to directly infringe one or more claims of the '980 patent by using the Accused Products and/or components thereof in accordance with 10x's instructions and encouragement. 10x has committed and continues to commit these acts of infringement without

21

license or authorization. Discovery is expected to show further how 10x's customers and/or end users perform the claimed steps of the '980 patent in conjunction with 10x's products.

75.     10x has contributed and continues to contribute to the infringement of one or more claims of the '980 patent under 35 U.S.C. § 271(c) by selling and/or offering to sell the Accused Products and/or components thereof within the United States for use by its customers and/or end users knowing that the Accused Products and/or components thereof are especially made or especially adapted for use in a manner that infringes one or more claims of the '980 patent and are not a staple article or commodity of commerce suitable for substantial non-infringing use. As a result of 10x's selling and/or offering for sale of the Accused Products and/or components thereof, other entities, on information and belief, use these products for their intended purpose and according to 10x's instructions with the result that such entities, such as 10x's customers and/or end users of the Accused Products and/or components thereof, directly infringe the asserted claims of the '980 patent, literally or under the doctrine of equivalents. 10x has committed and continues to commit these acts of infringement without license or authorization.

76.     Plaintiffs have suffered and continue to suffer damages because of 10x's infringement of the '980 patent.

77.     The infringement of the '980 Patent by 10x has been willful and deliberate, and continues to be willful and deliberate. At least as of August 4, 2026, if not earlier, 10x knew or should have known that its actions did and would constitute an unjustifiably high risk of infringement of the '980 patent. Such conduct constitutes, at minimum, willful infringement of the '980 patent, justifying an award of treble damages pursuant to 35 U.S.C. § 284.

78.    10x's development, marketing and sales of the Accused Products have caused SG to suffer irreparable injury for which damages are an inadequate remedy. Unless 10x is enjoined from infringing the '980 patent, 10x's infringing activities will continue to cause SG to suffer irreparable injury for which damages are an inadequate remedy.

### COUNT II: Infringement of the '129 Patent

79.    Plaintiffs incorporate the foregoing paragraphs of the Complaint by reference as if fully set forth herein.

80.    Caltech is the sole assignee of the '129 patent.

81.    SG is the exclusive licensee of the '129 patent.

82.    10x has directly infringed and continues to directly infringe one or more claims of the '129 patent, literally or under the doctrine of equivalents, by performing in the United States without authority each step of the claimed methods in conjunction with the Accused Products and/or components thereof. Attachment B provides an exemplary infringement claim chart for claims 1 and 52 of the '129 patent and exemplary and/or representative Accused Products.

83.    10x is and has been aware of the '129 patent and that the conduct identified herein would result in the infringement of one or more claims of the '129 patent. 10x has been aware of the '129 patents and its infringement at least since August 4, 2026, when SG notified 10x of the '129 patent and its infringement, and at least since the filing and service of this Complaint. On information and belief, 10x was aware of the patent family containing the '129 patent based on business discussions between 10x and SG conducted on or around June 1, 2021.

84.    10x has actively induced and continues to actively induce infringement, literally or under the doctrine of equivalents, of one or more claims of the '129 patent under 35 U.S.C. § 271(b) by making and selling the Accused Products and/or components thereof in the United

States and intentionally instructing or otherwise encouraging others, including 10x's customers and/or end users such as scientists working in laboratories that purchase the Accused Products and/or components thereof, to use the Accused Products and/or components thereof in the United States in a manner that infringes one or more claims of the '129 patent. On information and belief, 10x provided this instruction and encouragement to its actual and prospective customers and/or end users with the knowledge and intent that doing so would result in the infringement of one or more claims of the '129 patent by those customers and/or end users. One or more of 10x's customers and/or end users of the Accused Products and/or components thereof have directly infringed and continue to directly infringe one or more claims of the '129 patent by using the Accused Products and/or components thereof in accordance with 10x's instructions and encouragement. 10x has committed and continues to commit these acts of infringement without license or authorization. Discovery is expected to show further how 10x's customers and/or end users perform the claimed steps of the '129 patent in conjunction with 10x's products.

85.     10x has contributed and continues to contribute to the infringement of one or more claims of the '129 patent under 35 U.S.C. § 271(c) by selling and/or offering to sell the Accused Products and/or components thereof within the United States for use by its customers and/or end users knowing that the Accused Products and/or components thereof are especially made or especially adapted for use in a manner that infringes one or more claims of the '129 patent and are not a staple article or commodity of commerce suitable for substantial non-infringing use. As a result of 10x's selling and/or offering for sale of the Accused Products and/or components thereof, other entities, on information and belief, use these products for their intended purpose and according to 10x's instructions with the result that such entities, such as 10x's customers and/or end users of the Accused Products and/or components thereof, directly

24

infringe the asserted claims of the '129 patent, literally or under the doctrine of equivalents. 10x has committed and continues to commit these acts of infringement without license or authorization.

86.    Plaintiffs have suffered and continue to suffer damages because of 10x's infringement of the '129 patent.

87.    The infringement of the '129 Patent by 10x has been willful and deliberate, and continues to be willful and deliberate. At least as of August 4, 2026, if not earlier, 10x knew or should have known that its actions did and would constitute an unjustifiably high risk of infringement of the '129 patent. Such conduct constitutes, at minimum, willful infringement of the '129 patent, justifying an award of treble damages pursuant to 35 U.S.C. § 284.

88.    10x's development, marketing and sales of the Accused Products have caused SG to suffer irreparable injury for which damages are an inadequate remedy. Unless 10x is enjoined from infringing the '129 patent, 10x's infringing activities will continue to cause SG to suffer irreparable injury for which damages are an inadequate remedy.

### COUNT III: Infringement of the '224 Patent

89.    Plaintiffs incorporate the foregoing paragraphs of the Complaint by reference as if fully set forth herein.

90.    Caltech is the sole assignee of the '224 patent.

91.    SG is the exclusive licensee of the '224 patent.

92.    10x has directly infringed and continues to directly infringe one or more claims of the '224 patent, literally or under the doctrine of equivalents, by performing in the United States without authority each step of the claimed methods in conjunction with the Accused Products and/or components thereof. Attachment C provides an exemplary infringement claim chart for

25

claims 1, 11, 20 and 27 of the '224 patent and exemplary and/or representative Accused Products.

93.      10x is and has been aware of the '224 patent and that the conduct identified herein would result in the infringement of one or more claims of the '224 patent. 10x has been aware of the '224 patents and its infringement at least since August 4, 2026, when SG notified 10x of the '224 patent and its infringement, and at least since the filing and service of this Complaint. On information and belief, 10x was aware of the patent family containing the '224 patent based on business discussions between 10x and SG conducted on or around June 1, 2021.

94.      10x has actively induced and continues to actively induce infringement, literally or under the doctrine of equivalents, of one or more claims of the '224 patent under 35 U.S.C. § 271(b) by making and selling the Accused Products and/or components thereof in the United States and intentionally instructing or otherwise encouraging others, including 10x's customers and/or end users such as scientists working in laboratories that purchase the Accused Products and/or components thereof, to use the Accused Products and/or components thereof in the United States in a manner that infringes one or more claims of the '224 patent. On information and belief, 10x provided this instruction and encouragement to its actual and prospective customers and/or end users with the knowledge and intent that doing so would result in the infringement of one or more claims of the '224 patent by those customers and/or end users. One or more of 10x's customers and/or end users of the Accused Products and/or components thereof have directly infringed and continue to directly infringe one or more claims of the '224 patent by using the Accused Products and/or components thereof in accordance with 10x's instructions and encouragement. 10x has committed and continues to commit these acts of infringement without

26

license or authorization. Discovery is expected to show further how 10x's customers and/or end users perform the claimed steps of the '224 patent in conjunction with 10x's products.

95.    10x has contributed and continues to contribute to the infringement of one or more claims of the '224 patent under 35 U.S.C. § 271(c) by selling and/or offering to sell the Accused Products and/or components thereof within the United States for use by its customers and/or end users knowing that the Accused Products and/or components thereof are especially made or especially adapted for use in a manner that infringes one or more claims of the '224 patent and are not a staple article or commodity of commerce suitable for substantial non-infringing use. As a result of 10x's selling and/or offering for sale of the Accused Products and/or components thereof, other entities, on information and belief, use these products for their intended purpose and according to 10x's instructions with the result that such entities, such as 10x's customers and/or end users of the Accused Products and/or components thereof, directly infringe the asserted claims of the '224 patent, literally or under the doctrine of equivalents. 10x has committed and continues to commit these acts of infringement without license or authorization.

96.    Plaintiffs have suffered and continue to suffer damages because of 10x's infringement of the '224 patent.

97.    The infringement of the '224 Patent by 10x has been willful and deliberate, and continues to be willful and deliberate. At least as of August 4, 2026, if not earlier, 10x knew or should have known that its actions did and would constitute an unjustifiably high risk of infringement of the '224 patent. Such conduct constitutes, at minimum, willful infringement of the '224 patent, justifying an award of treble damages pursuant to 35 U.S.C. § 284.

27

98.     10x's development, marketing and sales of the Accused Products have caused SG to suffer irreparable injury for which damages are an inadequate remedy. Unless 10x is enjoined from infringing the '224 patent, 10x's infringing activities will continue to cause SG to suffer irreparable injury for which damages are an inadequate remedy.

### COUNT IV: Infringement of the '007 Patent

99.     Plaintiffs incorporate the foregoing paragraphs of the Complaint by reference as if fully set forth herein.

100.    Caltech is the sole assignee of the '007 patent.

101.    SG is the exclusive licensee of the '007 patent.

102.    10x has directly infringed and continues to directly infringe one or more claims of the '007 patent, literally or under the doctrine of equivalents, by performing in the United States without authority each step of the claimed methods in conjunction with the Accused Products and/or components thereof. Attachment D provides an exemplary infringement claim chart for claims 1, 3 and 6 of the '007 patent and exemplary and/or representative Accused Products.

103.    10x is and has been aware of the '007 patent and that the conduct identified herein would result in the infringement of one or more claims of the '007 patent. 10x has been aware of the '007 patents and its infringement at least since August 4, 2026, when SG notified 10x of the '007 patent and its infringement, and at least since the filing and service of this Complaint. On information and belief, 10x was aware of the patent family containing the '007 patent based on business discussions between 10x and SG conducted on or around June 1, 2021.

104.    10x has actively induced and continues to actively induce infringement, literally or under the doctrine of equivalents, of one or more claims of the '007 patent under 35 U.S.C. § 271(b) by making and selling the Accused Products and/or components thereof in the United

States and intentionally instructing or otherwise encouraging others, including 10x's customers and/or end users such as scientists working in laboratories that purchase the Accused Products and/or components thereof, to use the Accused Products and/or components thereof in the United States in a manner that infringes one or more claims of the '007 patent. On information and belief, 10x provided this instruction and encouragement to its actual and prospective customers and/or end users with the knowledge and intent that doing so would result in the infringement of one or more claims of the '007 patent by those customers and/or end users. One or more of 10x's customers and/or end users of the Accused Products and/or components thereof have directly infringed and continue to directly infringe one or more claims of the '007 patent by using the Accused Products and/or components thereof in accordance with 10x's instructions and encouragement. 10x has committed and continues to commit these acts of infringement without license or authorization. Discovery is expected to show further how 10x's customers and/or end users perform the claimed steps of the '007 patent in conjunction with 10x's products.

105.    10x has contributed and continues to contribute to the infringement of one or more claims of the '007 patent under 35 U.S.C. § 271(c) by selling and/or offering to sell the Accused Products and/or components thereof within the United States for use by its customers and/or end users knowing that the Accused Products and/or components thereof are especially made or especially adapted for use in a manner that infringes one or more claims of the '007 patent and are not a staple article or commodity of commerce suitable for substantial non-infringing use. As a result of 10x's selling and/or offering for sale of the Accused Products and/or components thereof, other entities, on information and belief, use these products for their intended purpose and according to 10x's instructions with the result that such entities, such as 10x's customers and/or end users of the Accused Products and/or components thereof, directly

29

infringe the asserted claims of the '007 patent, literally or under the doctrine of equivalents. 10x has committed and continues to commit these acts of infringement without license or authorization.

106. Plaintiffs have suffered and continue to suffer damages because of 10x's infringement of the '007 patent.

107. The infringement of the '007 Patent by 10x has been willful and deliberate, and continues to be willful and deliberate. At least as of August 4, 2026, if not earlier, 10x knew or should have known that its actions did and would constitute an unjustifiably high risk of infringement of the '007 patent. Such conduct constitutes, at minimum, willful infringement of the '007 patent, justifying an award of treble damages pursuant to 35 U.S.C. § 284.

108. 10x's development, marketing and sales of the Accused Products have caused SG to suffer irreparable injury for which damages are an inadequate remedy. Unless 10x is enjoined from infringing the '007 patent, 10x's infringing activities will continue to cause SG to suffer irreparable injury for which damages are an inadequate remedy.

### COUNT V: Infringement of the '868 Patent

109. Plaintiffs incorporate the foregoing paragraphs of the Complaint by reference as if fully set forth herein.

110. Caltech is the sole assignee of the '868 patent.

111. SG is the exclusive licensee of the '868 patent.

112. 10x has directly infringed and continues to directly infringe one or more claims of the '868 patent, literally or under the doctrine of equivalents, by performing in the United States without authority each step of the claimed methods in conjunction with the Accused Products

30

and/or components thereof. Attachment E provides an exemplary infringement claim chart for claims 2, 27-28 and 38 of the '868 patent and exemplary and/or representative Accused Products.

113.    10x is and has been aware of the '868 patent and that the conduct identified herein would result in the infringement of one or more claims of the '868 patent. 10x has been aware of the '868 patents and its infringement at least since August 4, 2026, when SG notified 10x of the '868 patent and its infringement, and at least since the filing and service of this Complaint. On information and belief, 10x was aware of the patent family containing the '868 patent based on business discussions between 10x and SG conducted on or around June 1, 2021.

114.    10x has actively induced and continues to actively induce infringement, literally or under the doctrine of equivalents, of one or more claims of the '868 patent under 35 U.S.C. § 271(b) by making and selling the Accused Products and/or components thereof in the United States and intentionally instructing or otherwise encouraging others, including 10x's customers and/or end users such as scientists working in laboratories that purchase the Accused Products and/or components thereof, to use the Accused Products and/or components thereof in the United States in a manner that infringes one or more claims of the '868 patent. On information and belief, 10x provided this instruction and encouragement to its actual and prospective customers and/or end users with the knowledge and intent that doing so would result in the infringement of one or more claims of the '868 patent by those customers and/or end users. One or more of 10x's customers and/or end users of the Accused Products and/or components thereof have directly infringed and continue to directly infringe one or more claims of the '868 patent by using the Accused Products and/or components thereof in accordance with 10x's instructions and encouragement. 10x has committed and continues to commit these acts of infringement without

31

license or authorization. Discovery is expected to show further how 10x's customers and/or end users perform the claimed steps of the '868 patent in conjunction with 10x's products.

115. 10x has contributed and continues to contribute to the infringement of one or more claims of the '868 patent under 35 U.S.C. § 271(c) by selling and/or offering to sell the Accused Products and/or components thereof within the United States for use by its customers and/or end users knowing that the Accused Products and/or components thereof are especially made or especially adapted for use in a manner that infringes one or more claims of the '868 patent and are not a staple article or commodity of commerce suitable for substantial non-infringing use. As a result of 10x's selling and/or offering for sale of the Accused Products and/or components thereof, other entities, on information and belief, use these products for their intended purpose and according to 10x's instructions with the result that such entities, such as 10x's customers and/or end users of the Accused Products and/or components thereof, directly infringe the asserted claims of the '868 patent, literally or under the doctrine of equivalents. 10x has committed and continues to commit these acts of infringement without license or authorization.

116. Plaintiffs have suffered and continue to suffer damages because of 10x's infringement of the '868 patent.

117. The infringement of the '868 patent by 10x has been willful and deliberate, and continues to be willful and deliberate. At least as of August 4, 2026, if not earlier, 10x knew or should have known that its actions did and would constitute an unjustifiably high risk of infringement of the '868 patent. Such conduct constitutes, at minimum, willful infringement of the '868 patent, justifying an award of treble damages pursuant to 35 U.S.C. § 284.

118.    10x's development, marketing and sales of the Accused Products have caused SG to suffer irreparable injury for which damages are an inadequate remedy. Unless 10x is enjoined from infringing the '868 patent, 10x's infringing activities will continue to cause SG to suffer irreparable injury for which damages are an inadequate remedy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter the following relief in its favor and against 10x:

A.  A judgment that United States Patent Nos. 10,457,980; 11,473,129; 12,305,224; 12,601,007; and 12,630,868 (the Asserted Patents) have been and continue to be directly and indirectly infringed by 10x;

B.  A judgment that 10x's infringement has been willful and deliberate;

C.  A declaration that each of the Asserted Patents is valid and enforceable;

D.  A permanent injunction enjoining 10x, its officers, agents, servants, and employees, and those persons in active concert or participation with any of them, from making using, selling, offering for sale, marketing, distributing, or importing the Accused Products and any other products infringing the Asserted Patents, and from inducing or contributing to any of the foregoing, prior to the expiration of the Asserted Patents. In the alternative, if the Court finds that a permanent injunction is not warranted, Plaintiffs request an award of post-judgment royalty to compensate for future infringement;

E.  An award of all determinably monetary relief adequate to compensate for damages resulting from 10x's infringement, including lost profits but in no event less than a

33

reasonable royalty under 35 U.S.C. § 284 for 10x's infringement, including all pre-judgment and post-judgment interest at the maximum rate allowed by law, and damages for willful infringement;

F. A declaration that the case is an exceptional case and that 10x be required to pay Plaintiffs' attorneys' fees pursuant to 35 U.S.C. § 285; and

G. A judgment awarding Plaintiffs such other and further relief as the Court may deem just, reasonable, and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial on all issues so triable.

*Of Counsel:*

Tamara D. Fraizer
SQUIRE PATTON BOGGS (US) LLP
1841 Page Mill Road, Suite 150
Palo Alto, CA 94304
(650) 856-6500
tamara.fraizer@squirepb.com

Soumitra Deka
SQUIRE PATTON BOGGS (US) LLP
550 California Street, Suite 1100
San Francisco, CA 94104
(415) 954-0200
sam.deka@squirepb.com

Xiaomei Cai
SQUIRE PATTON BOGGS (US) LLP
2325 E. Camelback Road, Suite 700
Phoenix, AZ 85016
(602) 528-4096
xiaomei.cai@squirepb.com

Dated: August 5, 2026

ASHBY & GEDDES

*/s/ Andrew C. Mayo*

Andrew C. Mayo (#5207)
Jeffrey J. Lyons (#6437)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
amayo@ashbygeddes.com
jlyons@ashbygeddes.com

*Attorneys for Plaintiffs*

34